We'll begin with the first case, which is 24-9507, Garcia-Botello v. Garland, counsel for appellant, if you would make your appearance and then proceed. Good morning, I may please the court. My name is Carolyn Welter and I'm here on behalf of Petitioner Javier Garcia. I would like to reserve three minutes for rebuttal. Mr. Garcia is here today because his mental disabilities, which stem from a life-altering car accident, caused him to act erratically and run afoul of the law. If removed to Mexico, where he will have no family and no treatment, Mr. Garcia will come into contact with the authorities and be tortured. That is what the evidence showed, and yet the agency reached a different conclusion by committing three crucial errors. As the court knows, a CAT applicant must show that he is first, more likely than not to be tortured, and second, that his tortures will represent mental culpability. The agency's first legal error, which speaks to mental culpability, is that it collapsed the disjunctive standard for specific intent and acquiescence and replaced it with its own incorrect standard. Specifically, the agency required that the entire Mexican government either specifically intend or acquiesce to Mr. Garcia's torture, which is- Well, to get to acquiescence, we have to find that you satisfied your burden on torture, right? Correct. So, how have you done that here? Yes, Your Honor. Mr. Garcia presented unrebuttable, credible evidence that were he to be removed to Mexico, he would have no access to medication and housing, that he would act combatively and come to the attention of authorities, and that he would then be detained or institutionalized. Despite this credible evidence, the immigration judge found that Mr. Garcia had not established this hypothetical chain of events, and the immigration judge and the board could only reach that conclusion by asserting their own opinion and by ignoring uncontradicted evidence. This- Didn't they do both? First said, don't really think you've proved this chain of events are more likely than not to happen, but even if they're more likely not to happen, it's not torture, it's a lack of resources. Yes, Your Honor. The immigration judge on whether it's torture kind of combined its analysis of specific intent, and so I think we would need to look to the specific intent and acquiescence piece in order to determine whether the third chain of hypothetical events is likely to occur. Can you expand on that? What do you mean? Yes, Your Honor. The IJ concluded that Mr. Garcia, even if he could satisfy the hypothetical chain of events, that his torturers would not act with the requisite specific intent or acquiescence. You keep saying his torturers. The finding was there was no torture. Yes, Your Honor. His potential torturers would be, in this case, prison guards, police officers, employees at mental health institutions, and members of criminal organizations. That's established on page 43 and 62 of Volume 2, and also page 400 and 467 of Volume 1. So we're talking about these four potential sources of torture. I think the, at least what I understood to be the position of the BIA, and somewhat segwaying from Judge McHugh's questions, is that even if you have this chain of events such that he ends up in a detention facility or he ends up in a mental health institution, the fact that he would be subject to conditions that in the United States, perhaps, would be viewed as horrific does not mean that he has been tortured. And that is the problem. I mean, it seems to me in your case, at least one of them, which is that the fact of squalor, the fact of some form of treatment that would not be deemed to be appropriate in the United States, doesn't mean that he's been tortured. I mean, the BIA, in his precedential decision, J.R.G.P. was pretty clear on that. And so you need to help us out. I mean, the fact that even whether your, you know, whether your chain of events occurs or not, doesn't answer the question, does it? Your Honor, Mr. Garcia presented evidence that, in addition to these substandard conditions, that his anticipated tortures will have the specific intent to torture. Specifically for police and military and prison guards, Mr. Garcia presented evidence that they will engage in beatings, electric shocks, asphyxiations, in order to extract confessions and punish Mr. Garcia. So is your position that a lobotomy, for instance, which is in the record as something that could happen in a mental institution in Mexico, is per se satisfying the standard of what constitutes torture? Because I think I understood that to be your argument, but I didn't really see you develop that. So if you could help me with that. I don't know if it's per se. I think the applicant must present evidence that the lobotomies are committed for a prescribed purpose. So in this case, Mr. Garcia presented evidence that lobotomies are oftentimes performed to coerce certain non-aggressive behavior. That's found on page 402 of the record. And by demonstrating that Mr. Garcia has satisfied the burden that lobotomies are performed for a specific intent. Okay, and so lobotomies as a means to correct behavior. Correct. Okay. Well, why isn't that consistent with the notion that they have different medical practices that we might deem to reflect a lack of education, lack of sophistication, all of those things. Why isn't that just segue into the notion that that's not designed to inflict pain. It's not designed to do these things for reasons that would seem to be within the contemplation of what the convention is about. But they're just practical means to run a medical facility. And if they are just practical means to run a medical facility, granted means that we would never employ here, then why is that torture? Your Honor, there is evidence that Mr. Garcia presented that employees at these mental health institutions will engage in acts for non-therapeutic justification or with no therapeutic justification. So specifically on page seven of volume two, there's evidence that individuals at these mental health institutions will often physically abuse patients. There is no therapeutic justification for such conduct. The conduct like lobotomies, where they might be done for some alternative reason other than to punish or inflict pain, arguably the actor is intending to inflict pain and suffering. They may be intending to inflict pain and suffering as what they see as a valid mean or for a valid reason, but they're still intending to inflict pain and suffering on the individual. That doesn't answer the question. Inflicting pain and suffering needs to be the end, not the means. If I'm inflicting pain and suffering because I'm trying to impose, I have some therapeutic goal in mind, then that's not torture, is it? If the actor intends to inflict pain and suffering, then that is sufficient. They know that pain and suffering will follow. Let's try that. Is there a distinction between those two? I believe so, yeah. Okay. Well, if I decide that, and if I decide for a non-therapeutic purpose, let's assume that in a mental health institution, they have one staff member per 100 patients, and they recognize having one staff member versus 100 patients, that boy, they have to create a certain level of interim effect to maintain control of that place. Which means that they impose punishment on people. They hit them. Corporal punishment in order to do that. Okay. Bad, bad thing to do. But is that torture within the meaning of the convention? And I would like to understand why it would be. Because along the lines of JRGB, all that is is a reflection of lack of resources. They're not doing this because they get kicks out of it. They're doing it because they have to maintain that facility. So, Your Honor, in Pierre v. Gonzales, the Second Circuit said that evidence of prescribed purposes, which include punishment, often overlaps with evidence of specific intent. And so the example you gave, you know, if they're beating these individuals in order to punish the individuals or coerce certain behavior, that is sufficient to demonstrate specific intent. Does the Mexican government have to acquiesce in this conduct? No, Your Honor. Does it have a cat claim? No, Your Honor. That is the major error of the agency here. By considering evidence of the Mexican government, the agency didn't consider the specific intent or the acquiescence that is possible by individual public officials. This Court and Argos Dewey, as well as the Ninth Circuit and Madrigal, have said that the entire government is not the relevant inquiry. The relevant inquiry is the conduct of these individual public officials. But if the government is taking action, even if that action is not fully effective, then you can't show the government acquiesced, can you? We do not need to show that the entire government acquiesced. We need to show that individual public officials will acquiesce to the torture. So you think the standard is that if any, any person tortures, that's enough? Yes, Your Honor. I think it would speak to the likelihood of torture. So if... But that person has to be a public official, right? To acquiesce to conduct, correct. Without the government acquiescing. You don't need governmental acquiescence if it's a public official, right? Yeah, you don't need entire government acquiescence. You don't need acquiescence at all if it's a public official? Yes, Your Honor, yes. If it's a private individual, then you need acquiescence on the part of individual public officials, but not the entire government. And if a public official tortures, then that's a whole different ballgame, right? That would be... There's no acquiescence component to that, right?  And that's your argument, right? That's the legal error that you're asserting here that the BIA made? Correct, yeah. By looking... If you look on page 208 and 209 of the record, they spent their entire analysis discussing the entire Mexican government. And that simply is not relevant. You know, Mexican government's anti-discrimination laws or closing of a single mental health facility doesn't negate the specific intent or the acquiescence on the part of individual public officials. Why isn't that? I'm sorry, go ahead. Oh, thank you, Chief. Are we permitted to look at the IJ's order to more fully understand the BIA's conclusion on acquiescence? Yes, Your Honor. Why is that? When the immigration... Or, excuse me, when the board does not engage in its own lengthy analysis, but merely just adopts the analysis of the immigration judge, you can look to the analysis of the immigration judge. So it's your position that the board here adopted the faulty analysis of the IJ? Yes, Your Honor. I see I'm running low on time. If there are no further questions, I'd like to reserve the remainder for rebuttal. Yes. Thank you. May it please the Court, I'm Duncan Fulton for the Department of Justice. Substantial evidence supports the agency's finding here that Petitioner failed to establish a specific intent, among other elements, for CAT deferral, which Congress intentionally crafted as a limited form of protection for aggravated felons such as Petitioner. But substantial evidence review doesn't apply to legal errors, right? Substantial evidence review applies to factual finding underlying those legal errors. This Court does have de novo authority for assessing the legal standard. So I'd like you to help me with framing where the government sees the error in this case. So likelihood of torture seems to encompass two inquiries, right? First we need to know what is likely to happen to the Petitioner, so that's a fact question, if he's removed. And then we need to know what is likely, if what is likely to happen amounts to torture. Where do you see the Petitioner's arguments directed here? Judge Rossman, if I'm understanding your question as to Petitioner's position, I think they're kind of doing both, if that makes sense. They're both attacking the legal standard, which I'm happy to get into this morning. But they're also asking that this Court mandate fact finders to make specific findings. Well, it seems to me that what they're arguing, and the trouble that I had with the BIA's decision, is that we can't do the second step. We can't determine as a matter of law whether what's likely to happen meets the definition of torture if we don't know what the BIA thinks is likely to happen. There doesn't seem to really be a complete factual finding on exactly what is likely to happen to the Petitioner here if he is removed. Your Honor, I think we do have that here. Where is it exactly? We can look at both the Board decision and the IJ decisions to respond to your Honor's earlier point for Petitioner. This Court can look at the IJ decision here to the extent that it provides a more complete explanation of what the Board did. That's from the case we cited from this Court and the scope and extent of review, this Court has that authority. So we can look at both decisions. If we start with the IJ decision at 207, at the top of it, the IJ talks about what is likely to happen to Petitioner. It says, first, he is not sufficiently established without his medication and treatment. So these are factual findings. Farther down the page, the IJ starts to make an alternate analysis saying even if we assume arguendo that this individual was unable to access his medication, Mexico did not have adequate support, here are our specific intent findings. Do you read the IJ and BIA to have found, the BIA refers to primitive medical practices. Do you read the BIA to have assumed that Mr. Garcia Botero is likely to experience a lobotomy if he is removed to Mexico? No, Your Honor. I don't read that the Board made any assumptions like that. Why is it fair to assume that he's not going to experience the most extreme treatment if that's what the record shows? Well, Your Honor, Petitioner has to show more likely that he would more likely than not experience torture for all the elements here for the CAT definition of torture. So that includes specific intent. That includes acquiescence. There's also a particularized risk requirement for torture here. So he has to show that he himself more likely than not would experience torture, including, to Your Honor's question, lobotomy. So I don't think the evidence here shows at all that he would more likely than not experience a lobotomy. There is country conditions evidence that lobotomies have occurred, but if I can just cite some of the authority here, Your Honors were asking about lobotomies earlier. If we look at page 629 of the record, it specifically talks about lobotomies and how they did occur to individuals who were showing aggression. And the intent behind this was to remove the potential for danger of that person to other individuals. So this kind of gets back to Chief Judge Holmes' question earlier about, you know, even if and I'm not trying to discount that there are some troubling incidents in the country conditions report, but Petitioner still has the burden to show a specific intent to inflict severe pain or suffering. So even though lobotomies have occurred, we don't have enough evidence here that it was done with the specific intent to inflict severe pain or suffering. And I'm sorry, I keep coming back to this, but if we're writing this opinion and we're reading the BIA's decision and we're reciting what the factual findings are about what is likely to happen to the petitioner if removed, just that factual finding, not the legal consequence of it, do you read the BIA's reference to primitive medical practices to include the most extreme form of mistreatment that the evidence supports? Your Honor, I don't see that specific finding by the board here, so I don't think we can assume that that inference was made by the agency. If we look at the board's decision at page five, it says, we will not disturb the immigration this is the first full paragraph at the top, we will not disturb the immigration judge's finding that even assuming the board will, the respondent will engage in erratic behavior that attracts law enforcement, he is not shown, he would more likely than not be tortured. So I'm talking about the next paragraph. The respondent asserts he's more likely than not will be subjected to primitive medical practices and abusive treatment in mental institutions in Mexico. We will not disturb the immigration judge's finding that such mistreatment would be the result of. So that goes on to talk about neglect, lack of resources, I think that gets to Chief Judge Holmes' point about the second piece of the analysis, which is the legal consequence. But are we supposed to read the first part of this as mistreatment in a narrow way or mistreatment as the most extreme form of mistreatment that the record would support? To make our legal determination of whether that's likely to satisfy the definition of torture under the statute. Your Honor, the language you just quoted, the respondent asserts he will be subjected to primitive medical practices. I don't read that as the board making a finding about that he would have a likelihood of being subjected to these practices. I think to the contrary, in this paragraph, the board is specifically saying he hasn't shown a specific intent, he hasn't shown a likelihood of that specific intent. He needs to do both of those things to prevail. I want to focus on the fact here that Petitioner has to make four showings here in order to  If he fails on any one of them, this court should deny the petition for Review 1. He has to show he will more likely than not be tortured, second, specific intent, third, acquiescence, and fourth, the record must compel a finding as to each one of those three  So I don't see the board as conflating anything here. There are a couple times where it talks about acquiescence and specific intent, but that's simply because those are two separate elements that the board and the IJ analyzed here. I do want to spend a couple minutes, Your Honors, talking about the legal standard here for specific intent. I just want to underscore the fact that this court has not looked at the issue in a published decision, but all 10 other regional circuit courts have explained that this specific intent requirement requires a very stringent showing. For instance, we can look at the Ninth Circuit's Villegas case where the actor must specifically intend the actual consequences, severe pain or suffering, of his conduct. So this court should not break away and essentially create a 1-10 circuit split, which is how I read what the Petitioner asks in part. I think there's some inconsistency there, but Well, does the actor also have to have undertaken that action for the specific purposes that are listed in the regs? It has to be for obtaining information or confession, punishment, intimidation or coercion or discrimination of any kind. Yes, Judge McHugh. I think, you know, there could be some debate about whether that's a subcomponent of the current motive requirement, but regardless how we look at it, it is a requirement for cap protection. There must be, the wrongdoer must be acting with a prescribed motive, such as punishment. But I think what is most important is this court should not define specific intent here to essentially include this acting with knowledge requirement that Petitioner puts forth, that pain may well occur. That's the reply brief at 20, for instance, where Petitioner puts forth that standard. That reading would run afoul of the great weight of these other circuits as well as the board. This acting with knowledge requirement that Petitioner submits is essentially a general intent requirement that has been roundly rejected by the other circuits. For instance, in the Third Circuit's Auguste decision where it specifically distanced itself from its prior dicta in Zubeda, which Petitioner quotes, but I think this court needs to know that that dicta has been rejected. Let me ask you this, turning to acquiescence. How does the evidence that the Mexican government has actually adopted anti-discrimination laws protecting the mentally challenged and has actually closed down some facilities and made some effort, how does that tie into the acquiescence piece if you have a government actor who is the one inflicting the pain? Well Your Honor, I think there may be two separate inquiries, if I'm understanding your question correctly. If the government itself is perpetrating the torture, we don't have to look at acquiescence. But I think in this situation we have here, where there are allegations that there are private individuals who are perpetrating them, such in private medical facilities, we do need to look at acquiescence as far as what the government was or was not doing. In this case, we have evidence that the board and the IJ did discuss the government at large, but we also have a lot of findings from the IJ, such as at page 207 and 208, talking about specifically what individual actors were doing. So we know the IJ and the board looked at individual actors here as far as the CAT elements, including acquiescence. I would also note that... What individual actors were doing in what context? In other words, elaborate on that point a bit, please. Well, for instance, we need to look at... When we're looking at acquiescence as far as individual actors, we're talking about whether the government efforts were sufficient. So we can talk about mid-level supervisors in a medical facility, what they were doing in the terms of acquiescence. What they were generally doing. Correct. And correct me if I'm wrong, what this sort of country conditions reports, these general comments about what the government does, it seems to me go to two things. They go to one, whether it's more likely than not that this individual will be tortured. Because if these practices are universal, then it increases the like that it's more likely than not that he will be tortured. Two, these government condition reports and what the government is doing in the mix, i.e. these sorts of efforts to control it, they also go towards the acquiescence piece. Because if the government has been engaged in vigorous efforts to address this problem, it also makes it... It cuts against the idea that it's more likely than not that they would acquiesce if this issue came to their attention. Yes, yes, Your Honor, I think that's right. Okay, because I guess I tease this out, because as I understand it from your opponent here, one of their concerns is the argument that we're not focusing on what individual actors, what individual government officials would acquiesce to, we're only focusing on what the government would acquiesce to. And I guess what I'm trying to get at is it seems to me that the evidence as it relates to what the government practices are inform our conversation as to what is more likely than not that individual government officials would do. I think that's generally true, Your Honor. I would also make the point here that I think... Generally true suggests you don't agree with me. And so I want to understand, am I making sense here? No, I think you are making sense. I just want to make the point that regardless we're looking at acquiescence or specific intent here, I think the most important factor of this case is we need to be giving deference to the factual findings of the IJ here. So, and this is where I think the biggest problem with Petitioner's argument, where we're talking about, you know, what specific intent needed to show, these are factual findings by the immigration judge who is considering all of the country conditions evidence. So even to the extent Petitioner disagrees with an inference about what the evidence shows, we can't, it would be improper to, for this court to require a fact finder to make those same inferential leaps in every given case. And I think that applies to specific intent. I think that applies to acquiescence. I would... So is your position that we can't infer, it would be inappropriate to infer specific intent from the nature of the anticipated acts that is in the record? I'm not saying a fact finder cannot infer. I'm saying that authority needs to lie with the fact finder about what the inferences show. And the evidence here simply doesn't show that it was necessary for the immigration judge to reach those factual findings. I do see I'm over time, Your Honors. Can I ask? Yes, of course. I have one follow-up question. Yes. If, would you agree that if we found the first part of the decision, that this chain of events that have to all occur in order for us even to be dealing with a potential torture, that if that wasn't more likely than not to happen, which is what the finding was, we don't even get in to all of this other stuff. That's correct, Your Honor. These are all alternate findings. So again, this court only needs to really uphold one of these issues to deny this petition for review. And it doesn't need to get into all the other issues to do so. Thank you. Thank you, Your Honors. Would you add a minute to her time, please? I want to raise three points, if time allows. The first, speaking to Judge McHugh's and Chief Judge Holmes' question about whether evidence of the anti-discrimination laws or closing of a mental health facility speak to the acquiescence piece. In Madrigal v. Holder, the Ninth Circuit said that the acquiescence of individual government officials is the relevant inquiry, as I've already stated. That includes when government officials are acting contrary to the policy of the entire Mexican government. While I think you're correct, Judge Holmes, that it speaks to the likelihood that individuals would acquiesce to such conduct, here we've presented evidence that multiple government officials, it's not just isolated incidents, many government officials acquiesce to conduct done by private individuals. Specifically, for employees of private mental health institutions, there's evidence on page 401 of Volume I and 111 of Volume II that government officials will often take the individuals, the adults with disabilities, to these institutions. And that despite being aware of all of these grave instances of torture, they do nothing to prevent or stop the torture. My second point that I would like to make, the government asserts that the applicant must prove specific intent and acquiescence. That is conflating the standard under the CAT. We're only required to prove specific intent or acquiescence, and acquiescence, of course, only comes to play if we're talking about private individuals committing acts of torture. And then my third point— Wait, wait, wait, are you—I need to understand this. If a private individual has specific intent, you're saying you don't need to show acquiescence on the part of the government? You do need to show acquiescence, but it's sufficient to show— Well, then you need to show both. Only if you're—you could prevail under just specific intent of public officials. Of a public official. Correct. If the public official is the actor. Correct. Okay, and going back to your point briefly about acquiescence, are you saying then that if I, as a government official, take, let's say, your petitioner to a mental health place, and I know they do lobotomies, that, by definition, I'm acquiescing in torture? Yes. All right, well, all right. Does it matter what likelihood it is that your particular petitioner will have a lobotomy? I mean, we don't know how often they do it. You have to have more likely than not, don't you? Yes, Your Honor, and if I may respond to the question and stay out of time.  Mr. Garcia presented evidence that he is specifically likely to be tortured for three reasons. His disability, specifically the way his disability manifests in having outbursts and aggressive behavior toward authorities. His status as a U.S. immigrant makes him more likely to be tortured, and also his lack of community support. If he doesn't have people around him to protect him, it makes him at a higher risk of being tortured. Thank you, Your Honor. Thank you, counsel. Case is submitted. Thank you for your fine arguments.